IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KELVIN DAVIS and SHARON DAVIS, KTD, JTD, JDD,<br><br>Plaintiffs,<br><br>v.<br><br>WENDY GARCIA, LORI HOLMES, VERONICA KASPRZAK, AMY REED, and CHARLENE SANSONE,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No.  2:07-cv-00148<br><br>Judge Clark Waddoups |

## I.    INTRODUCTION

Before the court is the Motion for Summary Judgment (Dkt. No. 169) filed by the only

remaining Defendants in this case, Wendy Garcia, Lori Holmes, Veronica Kasprzak, Amy Reed,

and Charlene Sansone, all current or former employees of the State of Utah's Division of Child

and Family Services ("DCFS" or the "Division").[1] After careful consideration of the parties'

positions as argued before the court and as presented in the parties' written submissions, the

court finds that it lacks subject matter jurisdiction over Plaintiffs' federal claims pursuant to the

*Rooker-Feldman* doctrine and over Plaintiffs' state law claims under the Utah Governmental

Immunity Act. Accordingly, the court grants Defendants' Motion for Summary Judgment in its

entirety, thus disposing of this case.

---

[1] Defendant Dwayne Betournay was dismissed without prejudice from this lawsuit pursuant to the court's Order dated June 26, 2009. (Dkt. No. 88.) He was then again named in the Third Amended Complaint (as were seven other individuals and entities that had been dismissed from the case on immunity grounds and the State of Utah and the Division of Child and Family Services, both of which were dismissed with prejudice in the court's June 26, 2009 Order [Dkt. No. 88]) and filed an Answer. However, he was never served with the Third Amended Complaint.

## II.    BACKGROUND

This is an unusual case in which the "factual matrix"[2] relevant for summary judgment purposes stems virtually entirely from state court orders and sworn statements by Plaintiffs in those and other related state court proceedings. Accordingly, the court takes notice of these statements as presented in Defendants' Memorandum in Support of their Motion for Summary Judgment. (Def.'s Mem. Supp. Mot. Summ. J. iv – xxiii, ¶¶ 1-95 [Dkt. No. 170].)

**The First Removal Petition**

Plaintiffs Kelvin Davis and Sharon Davis (nee Sharon Noe) have three minor children, KTD, JTD, and JDD. On February 23, 2006, before JDD was born, the Juvenile Court of the Second Judicial District Court of the State of Utah issued a Pre-Trial Order (the "First Pre-Trial Order") following hearings on the State's Verified Petition for Protective Supervision (the "First State Petition," filed on February 8, 2006)[3] concerning the custody of Plaintiffs' minor children. Kelvin was represented by counsel at the February 23, 2006 pre-trial hearing and Sharon was appointed counsel to represent her at later proceedings. Based on testimony from Defendant Amy Reid, who was a DCFS investigator assigned to the case, the Juvenile Court found in the First Pre-Trial Order that an emergency situation existed as to KTD because of her physical injuries and that, because it was contrary to her welfare to remain in the home, it would be in her best interest to be placed in the temporary custody of the Division. (First Pre-Trial Order, Ex. 7 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].)

---

[2] *See Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003) (reinforcing that the "factual matrix" must be considered in the light most favorable to the party asserting the injury where violation of a constitutional right is alleged and a defense of qualified immunity is raised).
[3] Case numbers 504495 and 504490.

DCFS and Reid were investigating Kelvin Davis and Sharon Noe in January and February 2006[4] because Sharon had informed her therapist that Kelvin had been abusing KTD, and her therapist had advised her that she should immediately contact DCFS to report the abuse. She filed a complaint with DCFS immediately after leaving the therapist's office on January 26, 2006. Later that day, Defendants Amy Reid and Charlene Sansone met Sharon at her residence where Sharon intended to take KTD and JTD with her to a shelter. The Defendant DCFS employees witnessed an altercation in which Kelvin and Sharon yelled at each other in front of the children and engaged in a tug-of-war with KTD, each pulling on one of the child's arms hard enough so that her feet were off of the ground. Police officers arrived on the scene to assist. When pressed, Kelvin argued that he had been granted custody of KTD but could not find the paperwork while DCFS and law enforcement officers were present. Ultimately, Kelvin and his mother, who lived in the house with Plaintiffs and who also provided sworn affidavits to the Juvenile Court describing Sharon's abusive behavior toward the children, decided to leave and stay in a hotel that night so that Sharon, KTD, and JTD could remain in the house without moving to a shelter at that time. (*See* Police Report, attached as Ex. 4 to Dep. Charlene Sansone, Ex. 1 to Pl.'s Opp. Mot. Summ. J. [Dkt. No. 180].) On January 27, 2006, however, Kelvin returned to the house with the previously issued custody order relating to KTD; Sharon therefore left the house taking only JTD with her to stay in the Safe Harbor shelter.

On or about the same day, Kelvin filed a Verified Petition for Child Protective Order[5] in which he described instances in which Sharon physically abused the children and expressed concern for their safety while in Sharon's care. (*See* CPS000534, Ex. 5 to Def.'s Mem. Supp.

---

[4] In addition, Plaintiffs Kelvin Davis and Sharon Noe were already known to DCFS based on Juvenile Court filings made by Kelvin as early as June 2003 when Kelvin had previously sought and obtained by default a custody order for KTD.

[5] Second Judicial District Court, Case No. 064700158, attached as Exhibit 5 to Defendants' Motion for Summary Judgment (Dkt. No. 170).

Mot. Summ. J. [Dkt. No. 170].) Specifically, in the Verified Petition, Kelvin swore that Sharon had "thumped [JTD] several times in the face" when she was crying in bed, left JTD unattended in eight inches of bath water, slammed KTD down onto the bed and slapped her in the mouth several times, pulled KTD by the arm up the stairs violently, frequently yelled and cursed at KTD, and that all of this had been going on for about ten months. (*Id.*)

In opposition to Kelvin's sworn statements in his Verified Petition, Sharon swore an Affidavit against Kelvin on February 10, 2006—in the midst of the ongoing DCFS investigation related to the State's Verified Petition for Protective Supervision—accusing Kelvin of abuse. (Aff. Sharon Noe in Opp. Prot. Order, Feb. 10, 2006, attached as Ex. 6 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) In this Affidavit filed with the Juvenile Court, Sharon states that

> [o]n or about January 19, 2006, [Kelvin] and I were residing together and we were watching his grandson. My daughter [KTD] was playing with his grandson when I heard [Kelvin] yelling at [KTD] and he dragged her upstairs and forced [KTD] to stand and face a wall with her hands in the air while he whipped her with a hanger. [Kelvin] would not let [KTD] either cry or put her hands down until she acknowledged that she had done something wrong.

(*Id.* at ¶ 5.) Sharon averred that Kelvin again beat KTD with a coat hanger when she would not stay in bed on January 25, 2006 and that he told Sharon that she "was too soft on [her] children and that they needed proper punishment." (*Id.* at ¶ 7.) On January 26, 2006, Sharon told her therapist about the beatings and that they had left bruises on KTD. (*Id.* at ¶ 8.) As mentioned, the therapist encouraged her to contact the DCFS, which she did. (*Id.* at ¶ 9.)

Two further pre-trial hearings were held on the First State Petition on March 9 and 10, 2006 at which both Kelvin and Sharon were present and represented by separate counsel. Neither party specifically denied the allegations in the State's Verified Petition for Protective Supervision, as amended by interlineation consistent with the Juvenile Court's findings of fact. Following these hearings, on March 29, 2006, the Juvenile Court entered a Dispositional Order

4

placing both children in the custody and guardianship of the Division. (*See* Findings of Fact, Conclusions of Law & Dispositional Order, March 29, 2006 ("March 29, 2006 Order"), attached as Ex. 1 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) In coming to this conclusion, the Juvenile Court issued Findings of Fact "based on the admissions and deemed admissions of the parties" and the evidence proffered. (*Id.* at 3.) The Juvenile Court included the following Findings of Fact relating to the January 26, 2006 incident in which Sharon tried remove her children from Kelvin's home and bring them to a shelter with her:

> In the course of the investigation, the Division went to the home of the mother and Kelvin Davis on or about January 26, 2006. Upon arrival, the mother indicated to the Division it would not be a good time for a visit because Kelvin Davis was already upset because he discovered that the mother was trying to leave. Subsequent to the Division's arrival, the mother and Kelvin Davis screamed at and were verbally abusive toward each other in the presence of the children. At one point, the mother tried to leave and began pulling the arm of the child, [KTD]. Kelvin Davis, who was holding [JTD], grabbed [KTD's] arm and pulled in the opposite direction. The mother and Kelvin Davis were pulling on [KTD] in opposite directions with sufficient force such that [KTD's] feet were not on the ground. [KTD] was screaming while she was being pulled by the mother and Kelvin Davis. Both parents continued to scream at each other, in the presence of the children, even after law enforcement responded to the scene.

(*Id.* at ¶ 7.) Sharon admitted these Findings of Fact; Kelvin neither specifically admitted nor denied the phrase "[KTD's] feet were not on the ground," invoking Rule 34(e) of the Utah Rules of Juvenile Procedure as to that phrase pursuant to which the statement is deemed admitted. In its Findings of Fact the Juvenile Court also noted Sharon's report of Kelvin beating KTD with a hanger for punishment and found that Kelvin also has hit KTD with a hanger when she has a toilet training accident. (*Id.* at ¶ 8.)

In the March 29, 2006 Order, the Juvenile Court also issued the following relevant Conclusions of Law: both children, KTD and JTD, were neglected within the meaning of Utah Code Ann. § 78-3a-103(1); both children were abused within the meaning of Utah Code Ann. §

78-3a-103(1)(a)(i); and the supported findings of the Division were substantiated by 'clear and convincing' evidence" (*Id.* at Conclusions of Law ¶¶ 2, 3, 4, 6). The Juvenile Court held that the Division's supported findings of physical abuse and domestic violence related child abuse against both Kelvin and Sharon were substantiated and would remain as substantiated in the Division's database. (*Id.* at ¶ 14.) Also, the children would be allowed to be removed from the State by the foster parents and/or kinship custodians for out of state travel, with the approval of the Guardian ad Litem. (*Id.* at ¶ 18.)

In his own sworn Answer to Sharon's Request to Return Custody and Guardianship of the Children to Mother, which he submitted on June 29, 2006, Kelvin made further sworn accusations against Sharon, including that his mother Ona J. Davis "has witnessed Sharon Noe physically snatch, grab, drag, and hit [KTD]." (June 29, 2006 Answer at ¶ 7, attached as Ex. 3 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].)

In a July 13, 2006 Review Order, the Juvenile Court reaffirmed prior orders not inconsistent with this order and found that both children may have certain medical procedures completed while in foster care. (July 13, 2006 Review Order, attached as Ex. 10 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) Then, in a September 18, 2006 Permanency Order, after a hearing at which both Kelvin and Sharon were present and represented by counsel, the Juvenile Court found that the Division had made reasonable efforts to provide reunification services. (September 18, 2006 Permanency Hearing Findings and Order, at ¶¶ 4-5 & 12, attached as Ex. 11 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) In the September 18, 2006 Order, the Juvenile Court terminated reunification services for Kelvin and placed the children in full legal and physical custody and guardianship of Sharon with protective supervision services for

newborn JDD, ordering also that Kelvin's parent time with the children would be as authorized and supervised by the Division. (*Id.* at ¶¶ 2, 4-5 & 8.)

**The Second Removal Petition**

The State of Utah filed another Verified Petition on or about May 10, 2006 (the "Second State Petition") relating to the newborn child JDD. Kelvin and Sharon both appeared at a June 8, 2006 pre-trial hearing at which both were represented by counsel. The Juvenile Court issued Findings of Fact, Conclusions of Law & Dispositional Order on June 29, 2006 (the "June 29, 2006 Dispositional Order"), which Sharon admitted in its entirety and Kelvin admitted with the exception of allegations of his paternity. (June 29, 2006 Dispositional Order at 2, attached as Ex. 13 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) The Juvenile Court entered the following Findings of Fact by clear and convincing evidence:

> 7. There is an ongoing child welfare case before this Court involving the children, [KTD] and [JTD], under Case Numbers 504495 and 504490. On March 9, 2006, the Court found by clear and convincing evidence that the children, [KTD] and [JTD], were abused and neglected children. The Court found that it had original exclusive jurisdiction over the children, [KTD] and [JTD], pursuant to Utah Code Ann. § 78-3a-104(c).
>
> 8. The Child, [JDD], is at risk of being neglected because another minor in the same family is a neglected child.

(*Id.* Findings of Fact ¶¶ 7-8.) The Juvenile Court found that JDD was a neglected child within the meaning of Utah Code Ann. § 78-3a-103(1)(s)(i)(E). (*Id.* Conclusions of Law ¶ 2.) JDD was to remain in Sharon's custody under the protective supervision of the Court. (*Id.* at ¶¶ 2-3.) The Division was ordered to provide protective supervision services to JDD and the family. (*Id.* at ¶ 4.)

The June 29, 2006 Dispositional Order further provided that "[t]he services offered and [sic] by the Division of Child and Family Services under the treatment plan as directed by the

Court under this Court Order constitute reasonable efforts on the part of the Division . . . within the meaning of Utah Code Ann. § 78-3a-311(2)(c)(ii)", and that "the parties have been provided notice of their rights and responsibilities should they wish to challenge any appealable order in this child welfare case, pursuant to Utah Code Ann. § 78-3a-909" (*id.* Order ¶¶ 8-9).

Plaintiffs did not at any time challenge or appeal this or previous Orders of the Juvenile Court in the various domestic violence and custody-related matters concerning these parties.

In a November 22, 2006 Pre-Trial Order issued in relation to the State's November 3, 2006 Motion for Order to Show Cause against Kelvin, the Juvenile Court found that "[c]ontinuation in the home would be contrary to the welfare of the children." (November 22, 2006 Pre-Trial Order on Motion to Show Cause, attached as Ex. 14 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) After a hearing on the Order to Show Cause, the Juvenile Court issued Amended Findings of Fact, Conclusions of Law and Order to Show Cause, noting that Plaintiffs had been married and were now living together after the marriage. (March 15, 2007 Amended Findings of Fact, Conclusions of Law and Order to Show Cause 2, attached as Ex. 16 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) The March 15, 2007 Order discussed a sound recording of an October 17, 2006 incident entered as evidence during the hearing on the Motion for Order to Show Cause, observing that "[a]ll three children were present in the vehicle when the recording was made" on Sharon's cellular phone. (*Id.* at 3, ¶¶ 6-7.) In its Findings of Fact, the Juvenile Court found that the recording depicted Kelvin yelling at and cutting off Sharon between 24 and 36 times. (*Id.* at 4, Findings of Fact ¶ 1.) The Court noted that "it appeared that a child was crying during father's loud and repeated statements and this appeared to cause fear or concern to the child or children." (*Id.* at 4, Findings of Fact ¶ 7.) On this basis, the Juvenile Court found that "[t]he facts found by the Court fit within the definition of abuse under the Juvenile

Court Act, and as defined by Utah's appellate courts," that Kelvin had intentionally and willfully violated its previous Order enjoining him from acts of domestic violence, and that he was therefore in contempt of court. (*Id.* at 7, Conclusions of Law ¶¶ 1-4.)

**The Third Removal Petition**

On or about November 7, 2006, the State of Utah filed another Verified Petition for Custody (the "Third Removal Petition") as to all three children. Kelvin and Sharon were present and represented by separate counsel at a pre-trial hearing on November 22, 2006. In the Juvenile Court's Pre-Trial Order dated November 22, 2006 relating to the Third Removal Petition, the Juvenile Court found that "[t]here has been no denial of due process in the State's request for temporary custody. The parties are now married and have been living together since November 1, 2006. It is unsafe for the children to remain with the parents." (Pre-Trial Order dated Nov. 22, 2006, at 4 ¶ 17, attached as Ex. to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) The Juvenile Court further ordered that "[t]he parents shall not do anything to frighten or alarm the children pursuant to the removal. The parents shall not notify anyone regarding action which may lead to children being secreted or removed by anyone." (*Id.* at 6 ¶ 17.) The Juvenile Court ordered that the children be placed in temporary custody of the Division and that all prior orders not inconsistent with this Order were to remain in effect. (*Id.* at 5 ¶¶ 9-11.)

Kelvin and Sharon were represented by separate counsel at the trial on the Third Removal Petition on December 13, 2006. The Juvenile Court found by clear and convincing evidence that the parents were involved in a domestic violence incident on October 17, 2006. (May 21, 2007 Findings of Fact, Conclusions of Law and Disposition Order 8, Findings of Fact ¶ 5, attached as Ex. 17 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) The Juvenile Court also found that "[t]he mother's counsel filed a Court Report on her behalf outlining her progress that was due, in

9

part, to separating from the influence of the father. Custody was restored to the mother on September 18, 2006, in part, because of the mother's progress and protection of the children by distancing her family from the father" (*id.* at ¶ 7); "[t]he mother has started to recant the original allegations that led to Division and court involvement. The mother has expressed frustration at being unable to better her financial situation to her satisfaction" (*id.* at ¶ 8); "[t]he mother's therapist feels that she is emotionally and intellectually absent during therapy sessions, and that she is most certainly not internalizing the things that are discussed, or integrating any of the changes she needs to make to remain herself and keep her children safe" (*id.* at ¶ 9); and "[t]he parents are likely to repeat the same patterns of behavior and attitude that they have engaged in during the past. Specifically, the mother is likely to make allegations against the father and leave him again, only to recant her allegations and reconnect with him. The father's Schizophrenia is expected to be exacerbated by stress" (*id.* at ¶ 22).

In its Conclusions of Law, the Juvenile Court found that the children were neglected by both parents within the meaning of Utah Code Ann. § 78-3a-103, had been abused by Kelvin, could not safely remain in the home, and should be placed in the custody and guardianship of the Division for appropriate placement. (*Id.* at 13, Conclusions of Law ¶¶ 2-5.) The Court found "by clear and convincing evidence" that the services offered by the Division constituted "reasonable efforts on the part of the Division" within the meaning of Utah Code Ann. § 78-3a-311. (*Id.* ¶ 7.) The Court ordered that "[i]n light of their tender ages and length of time in custody, the permanency goal for the children shall be adoption, with a concurrent goal of permanent custody and guardianship." (*Id.* Order ¶ 9.)

Kelvin then began making filings in the Juvenile Court alleging that the actions taken against him throughout this process were racially motivated based on an attempt to segregate him

from Sharon and the children. (*See* Exs. 18-20 attached to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) As an African American, Kelvin alleged, he has never been treated fairly "in Judge Wilkins court room, DCFS office, and the Attorney General's office." (September 28, 2007 Memorandum of Opposition to Motion to Appoint Counsel for Kelvin Davis ¶ 6, attached as Ex. 21 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) Kelvin alleged that "[t]o use my disability in an unprofessional way violates my civil rights" and that "[m]y civil rights and civil liberties have been violated in these court procedures." (*Id.* at ¶¶ 7, 13.)

Nevertheless, on February 15, 2008 following Judge Nelson's recusal of the entire Second District as a result of Kelvin's allegations (*see* Exs. 22-24, attached to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170]), Judge James R. Michie of the Third District Court in Salt Lake City, where the matter had been transferred, ordered that "[t]emporary custody and guardianship of K[TD], J[TD], and J[DD] is continued with the Division of Child and Family Services." (February 25, 2008 PreTrial Order, attached as Ex. 25 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) Judge Michie later set a goal of "reunification and a concurrent goal of Individualized Permanency" and authorized a trial home placement subject to the approval of the Guardian ad Litem (May 19, 2008 Dispositional Order, attached as Ex. 26 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170]); eventually, Judge Michie found that the Division had made reasonable efforts to finalize the permanency goal to return the children home and ordered custody and guardianship returned to the Plaintiffs. (September 8, 2008 Review Order, attached as Ex. 27 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].)

Once again, neither Plaintiff ever appealed any of the multitude of Orders issued by the Juvenile Court in the myriad proceedings outlined above. However, Sharon made further sworn statements relating to domestic violence and abuse perpetrated by Kelvin in a 2010 divorce

proceeding. (*See* Exs. 28-29, attached to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].)

Plaintiffs commenced this case on November 1, 2007 but did not file a written Notice of Claim

as required by law until on or about July 23, 2009, the date it was received by the Utah Attorney

General's Office. (*See* July 22, 2009 Letter re "Notice of Claim", attached as Exh. 30 to Def.'s

Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) Also, in addition to making claims for negligence,

negligent supervision, negligent hiring, negligent and intentional emotional distress, and willful

misconduct, Plaintiffs alleged physical and sexual abuse suffered by the children while in the

temporary custody of DCFS and foster care in their Complaint. However, to this date, no

criminal charges have ever been filed related to any abuse allegations of the minor children while

in the temporary custody of DCFS and placed in foster care. (*See* Def.'s Mem. Supp. Mot.

Summ. J. xxiii ¶ 98 [Dkt. No. 170].)

### III.    DISCUSSION

**A.    Summary Judgment Standard**

Rule 56(a) requires the court to grant summary judgment "if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. Pro. 56(a) (2012). The "long prevailing standard for summary judgment—

firmly established in Supreme Court precedent—has been that the moving party must first

establish the absence of a genuine issue of material fact on the claims or elements as to which it

is moving for summary judgment." *Wilcox v. Career Step, LLC*, No.: 08-cv-00998-CW, 2013

U.S. Dist. LEXIS 33427, at *27 (D. Utah Mar. 6, 2013) (quoting *Kannady v. City of Kiowa*, 590

F.3d 1161, 1168-1169 (10th Cir. 2010)).

If "a properly supported motion for summary judgment is made, the adverse party 'must

set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting the pre-amendment version of Rule 56(e)).[6] In opposing summary judgment, therefore, Plaintiffs must provide "significant probative evidence tending to support the complaint." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968) ("What Rule [56] does make clear is that a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him."); *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) ("in response to a properly supported motion for summary judgment, a non-movant must produce sufficient evidence for a reasonable trier of fact to find in its favor at trial on the claim or defense under consideration"). But "the movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Wilcox*, 2013 U.S. Dist. LEXIS 33427, at *14 (quoting *Kannady*, 590 F.3d at 1169) (internal alterations omitted). The court must then determine, as a threshold matter, "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The court must examine the factual record "in the light most favorable to the party opposing summary judgment." *Kannady*, 590 F.3d at 1168 (quoting *Belhomme v. Widnall*, 127 F.3d 1214, 1216 (10th Cir. 1997)). Somewhat unusually, in this case, the "factual matrix" arises almost entirely from state court orders and Plaintiffs' own sworn statements in other state court proceedings. *Cf. Carr*, 337 F.3d at 1227. As a result, and particularly relevant for the application of the *Rooker-Feldman* doctrine to this case, Plaintiffs are not able to raise a "*genuine* issue of *material* fact," *Anderson*, 477 U.S. at 248 (emphasis in original), without admitting they were being untruthful in previous sworn statements. The court will not indulge such an inconsistency,

---

[6] See *Wilcox*, 2013 U.S. Dist. LEXIS 33427, at *13-*14 & n.5 for a discussion of the 2010 amendments to Rule 56.

nor need it do so where, as here, Plaintiffs' claims are entirely barred by operation of law in the absence of a genuine factual dispute.

**B.     Plaintiffs' Federal Claims and the *Rooker-Feldman* Doctrine**

Plaintiffs have alleged violations of their rights under both the Fourth and Fourteenth Amendments to the Constitution. In addition to their arguments grounded in the *Rooker-Feldman* doctrine, Defendants move for summary judgment on Plaintiffs' federal constitutional claims based on collateral estoppel and qualified immunity. The court has carefully considered each of these defenses and finds that Plaintiffs' claims would be barred under each, analyzed separately; however, the court does not provide a detailed analysis of either of these alternative defenses because it finds that it lacks jurisdiction over Plaintiffs' federal claims under the *Rooker-Feldman* doctrine.

**1.     The *Rooker-Feldman* Doctrine**

Because the *Rooker-Feldman* doctrine is jurisdictional, it merits consideration before and independent of the *res judicata* and qualified immunity arguments that are equally insurmountable for Plaintiffs. *See Skinner v. Switzer*, 131 S. Ct. 1289, 1298 (2011) (observing that federal district courts lack subject matter jurisdiction over claims fitting the *Rooker-Feldman* pattern). "The *Rooker-Feldman* doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced." *Mann v. Boatright*, 477 F.3d 1140, 1146 (10th Cir. 2007) (internal quotation marks omitted).

Plaintiffs allege that Defendants violated their Fourth Amendment rights when Defendants caused the removal of the children without a warrant and, allegedly, without probable cause. (*See* Third Amended Complaint ¶¶ 95-106 [Dkt. No. 105].) Plaintiffs further

14

claim that their substantive and procedural due process rights under the Fourteenth Amendment were violated when Defendants removed the children based on allegedly false and unverified statements to the Juvenile Court. (*See id.* at ¶¶ 107-121.) Plaintiffs seek monetary damages for harm allegedly caused by the removal of the children from their custody.

To countenance either of these claims, the court would effectively need to act in an appellate capacity with respect to the Juvenile Court's disposition of the various matters brought before it by the State of Utah and each of the Plaintiffs, as outlined in the undisputable facts reviewed above. The *Rooker-Feldman* doctrine deprives this court of subject matter jurisdiction in such situations. *P.J. ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1193 (10th Cir. 2010) ("Generally, the *Rooker-Feldman* doctrine precludes lower federal courts from effectively exercising appellate jurisdiction over claims actually decided by a state court and claims inextricably intertwined with a prior state-court judgment.").

This is a case brought by "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). As such, it constitutes the type of situation that the *Rooker-Feldman* doctrine is meant to address. *Id.* The "doctrine" arose when "parties defeated in state court turned to a Federal District Court for relief," asking the federal court to declare the state court's judgment "null and void." *Id.* (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 414-14 (1923)). The *Rooker* Court recognized that the remedy for an incorrect state court decision would be to make a timely appeal of that decision within the state court system; it therefore affirmed the lower federal court's dismissal of the case for lack of jurisdiction because federal courts exercise "strictly original" jurisdiction and, as a result, "lack the requisite appellate authority." *Id.* (citing

*Rooker*, 263 U.S. at 416). This principle was reinforced in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) when the Supreme Court held that the District Court for the District of Columbia lacked subject matter jurisdiction to review a decision of the District of Columbia Court of Appeals that was "judicial in nature." *Id.* at 285-86 (citing *Feldman*, 460 U.S. at 482). It added that claims not actually decided by a state court but "inextricably intertwined" with a state court decision were also outside lower federal courts' jurisdiction. *Id.* (citing *Feldman*, 460 U.S. at 486-86). In short, "[a]ppellate review—the type of judicial action barred by *Rooker-Feldman*—consists of a review of the proceedings already conducted by the 'lower' tribunal to determine whether it reached its result in accordance with law." *Bolden v. City of Topeka, Kansas*, 441 F.3d 1129, 1143 (10th Cir. 2006).

The Supreme Court has recently re-emphasized the "'narrow ground' occupied by the doctrine," holding that it "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers . . . inviting district court review and rejection of [the state court's] judgments." *Skinner*, 131 S. Ct. at 1297 (quoting *Exxon Mobile*, 544 U.S. at 284). The Tenth Circuit approaches jurisdictional questions under the *Rooker-Feldman* doctrine "by asking whether the state-court judgment *caused*, actually and proximately, the *injury* for which the federal-court plaintiff seeks *redress*, paying close attention to the *relief* sought in the federal suit." *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1237 (10th Cir. 2006) (citing *Kenman Eng'g v. City of Union*, 314 F. 3d 468, 476 (10th Cir. 2002) (emphasis in original, internal quotation marks omitted)). The *Rooker-Feldman* doctrine does not deprive the district court of jurisdiction where only prospective relief is sought—or where no retrospective relief is sought that would "undo" a state court judgment; thus, the doctrine would not ordinarily apply to claims for only injunctive or declaratory relief. *Jensen*, 603 F.3d at 1193 (citing *Mo's Express*, 441 F.3d at

16

1238). On the other hand, claims seeking "retrospective relief" invalidating past action or monetary damages as compensation for injury caused actually and proximately by state court judgments, *see Mo's Express*, 441 F.3d at 1238, would be barred under the *Rooker-Feldman* doctrine if "success on the claims would require the district court to review and reject those judgments." *Jensen*, 603 F.3d at 1193 (citing *Mann* 477 F.3d at 1147 (internal quotation marks and alterations omitted)). The analysis must resist "commingling *res judicata* and *Rooker-Feldman* principles," *Mo's Express*, 441 F.3d at 1236, because "*Rooker-Feldman* is not simply preclusion by another name" and conflating the two "risks turning that limited doctrine into a uniform *federal* rule governing the preclusive effect of state-court judgments, contrary to the Full Faith and Credit Act" *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (emphasis in original).

Moreover, the Supreme Court has also held that "*Rooker-Feldman* does not apply against nonparties to the prior judgment in state court." *Mo's Express*, 441 F.3d at 1235 (citing *Lance*, S. Ct. at 1202). On this basis, in *Mo's Express*, the Tenth Circuit reversed the district court's invocation of *Rooker-Feldman* as a jurisdictional bar where "[o]nly one of the Plaintiffs, Mo's Express, was a party to the decision of the Colorado Supreme Court" in the state court proceeding. *Id.* at 1236 (also holding that the district court erred in applying *Rooker-Feldman* to Mo's Express because it only sought prospective declaratory and injunctive relief rather than any "money damages that would compensate them," *id.* at 1238, for the injury caused by the state court decision). Here, the Juvenile Court removal orders and other dispositions related to the minor children who appear in the case captions. The parents Kelvin and Sharon, however, were also indisputably parties to the action as their parental and custody rights were at issue. In addition, the Tenth Circuit has recognized that "the 'parties' to a state-court judgment for *Rooker-Feldman* purposes include all persons *directly bound by the state-court judgment*,

17

whether or not they appear in the case caption." *Id.* at 1235 n.2 (discussing the holding in *Kenman Eng'g*, 314 F.3d at 481) (emphasis in original). Although the Supreme Court in *Lance* addressed the issue in reversing a district court's misapplication of the *Kenman Engineering* holding, it "did not repudiate the narrow holding of *Kenman Engineering* concerning parties directly bound by the state-court judgment—who would seem to fall squarely within the definition of 'state-court losers'." *Id.* (citing *Exxon Mobile*, 125 S. Ct. at 1521). Kelvin and Sharon were parties directly bound by the state-court judgment and are therefore "state-court losers" for purposes of the *Rooker-Feldman* analysis.

### 2.    *Plaintiffs' Fourth Amendment Claim*

Plaintiffs' first and second claims—that Defendants' violated the Fourth and Fourteenth Amendments in their handling of the case—are similar to those brought by the plaintiffs in *P.J. ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1193 (10th Cir. 2010). In *Jensen*, the Tenth Circuit reviewed Judge Stewart's ruling that the *Rooker-Feldman* doctrine did not apply to claims brought by parents alleging constitutional violations when the State of Utah ordered that custody of their son be transferred to the State as a result of the parent's refusal to consent to cancer treatment for their son. The Juvenile Court had ordered that custody be transferred to the State for treatment, and after the parents violated the Court's order, they were arrested and charged with custodial interference and felony kidnapping. The parents claimed violations of their substantive and procedural due process rights, and of their Fourth Amendment right to be free of unreasonable seizure "based on the alleged malicious prosecution of the Jensens." *See Jensen*, 603 F.3d at 1192.

The Tenth Circuit reversed Judge Stewart's decision with respect to the applicability of *Rooker-Feldman* to the Jensens' Fourth Amendment claim based on malicious prosecution. One

of the elements of malicious prosecution that the Jensens needed to prove was that "no probable cause supported the Jensens' original arrest, continued confinement, or prosecution." *Id.* at 1194. To make this showing, the Jensens would have needed to "convince a lower federal court that there was no probable cause for the prosecution of either the juvenile court proceedings or the criminal proceedings." *Id.* But because "those state court proceedings resulted in adverse judgments for the Jensens," the Tenth Circuit held, "a lower federal court would necessarily have to review and reject those judgments in order for the Jensens to succeed" on their Fourth Amendment claim. *Id.* The district court, therefore, lacked jurisdiction over that claim under the *Rooker-Feldman* doctrine. *Id.*

Plaintiffs' Fourth Amendment claim in this case is no different. Plaintiffs allege that their Fourth Amendment rights were violated when their children were removed from their home without a warrant and allegedly without probable cause. (*See* Third Amended Complaint ¶¶ 95-106 [Dkt. No. 105].) As Defendants note, "[t]his is not a case where the removal of the children preceded the state court's order." (Def.'s Mem. Supp. Mot. Summ. J. 5 n.3 [Dkt. No. 170] (citing *Silvan v. Briggs*, 2009 WL 159429 (10th Cir.).) Rather, "[a]ll of the damages sought by Plaintiffs spring from the state court orders dealing with the removal and custody of the children." (*Id.* at 5.) The children were not removed from the home during the Division's employees' visit on January 26, 2006. Instead, Kelvin and Sharon worked out a temporary solution under which Sharon was able to stay in the home that night instead of going to a shelter. The Juvenile Court later ordered the removal of the children based on its Findings of Fact and Conclusions of Law, as outlined above. As in *Jensen*, Plaintiffs here would have to prove that "no probable cause supported" the removal of the children from the home. *Jensen*, 603 F.3d at 1194.

The Tenth Circuit has recognized that "the forced separation of parent from child, even for a short time, represents a serious impingement upon both the parents' and child's rights. Of course, the child also has obvious and compelling interests in his personal welfare and safety, which are opposed to those of his parents when they pose the threat to the child's safety." *J.B. v. Wash. County*, 127 F.3d 919, 925 (10th Cir. 1997) (internal quotation marks and citations omitted). Here, as in *J.B.*, "[t]he gravamen of plaintiffs' Fourth Amendment claim in this case is the court-ordered seizure of" the children. *Id.* at 928. And, in that respect, the Tenth Circuit held that a Juvenile Court removal order is owed "the same deference . . . that we would owe to a magistrate's finding of probable cause in issuing a warrant." *Id.* at 930.

The theory under which Plaintiffs here are seeking relief on their Fourth Amendment claim, therefore, as in *Jensen*, implicates the touchstone for *Rooker-Feldman* inquiries: the court would necessarily need to "review and reject" the state court orders resulting in the adverse judgments for Plaintiffs in order to find for Plaintiffs. *Jensen*, 603 F.3d at 1194. The children were removed pursuant to Juvenile Court Orders which, in turn, are owed the same deference as to probable cause as a magistrate judge's issuance of a warrant. *J.B.*, 127 F.3d at 930. Plaintiffs are seeking "retrospective relief" that would "undo" the state court judgment if successful. *Mo's Express*, 441 F.3d at 1238. The Juvenile Court's removal Orders "*caused*, actually and proximately, the *injury* for which the federal-court plaintiff seeks *redress*" on their Fourth Amendment claim. *Id.* at 1237 (emphasis in original). Plaintiffs did not appeal the numerous Juvenile Court Orders relating to their parental and custody rights, though that would have been the appropriate avenue for relief. This court, by contrast, "lack[s] the requisite appellate authority" to "review and reject," *Exxon Mobil*, 544 U.S. at 284 (citing *Rooker*, 263 U.S. at 416), or in any way "undo" the Juvenile Court's decisions, *Mo's Express*, 441 F.3d at 1238. The court

therefore does not have jurisdiction over Plaintiffs' Fourth Amendment claim under the *Rooker-Feldman* doctrine.

### 3. *Plaintiffs' Fourteenth Amendment Claim*

Whereas the Tenth Circuit reversed Judge Stewart's decision rejecting the application of the *Rooker-Feldman* doctrine to the *Jensen* plaintiffs' Fourth Amendment claim, the Tenth Circuit affirmed Judge Stewart's ruling with respect to the Jensens' substantive and procedural due process claims under the Fourteenth Amendment. *Jensen*, 603 F.3d 1194. In other words, the Tenth Circuit agreed with Judge Stewart that the *Rooker-Feldman* doctrine did not apply to prevent the District Court from exercising jurisdiction over those claims. This was because the Jensens' Fourteenth Amendment claims were based on "misrepresentations allegedly made by the defendants during the juvenile court proceedings" and "alleged failure to conduct an independent investigation" of the minor's case "before filing the verified petition" for removal. *Id.* Although the *Rooker-Feldman* doctrine precludes jurisdiction not only for "claims actually decided by a state court" but also for "claims inextricably intertwined with a prior state-court judgment," *Mo's Express*, 441 F.3d at 1233, the Jensens' claims for misrepresentation and failure to investigate as the basis of their Fourteenth Amendment claims—though "closely connected" to the adverse state court proceedings—were "sufficiently extricable from any state-court judgment for *Rooker-Feldman* purposes." *Jensen*, 603 at 1194. Moreover, the *Jensen* Court held, "the Jensens' substantive and procedural due process claims would be identical even if there were no state-court orders adverse to the Jensens. Therefore, these claims do not allege injuries caused by state-court judgments . . . ." *Id.* (citation and internal quotation marks omitted).

Here, it is true that Plaintiffs' substantive and procedural due process claims under the Fourteenth Amendment closely resemble the Jensens' claims. To summarize, Plaintiffs claim that their constitutional right to familial integrity was interfered with by Defendants' removal of their children without permission and allegedly without cause, and, allegedly, by several pre-judgment activities including Defendants' alleged failure to give Plaintiffs notice of the status of actions being taken against them, Defendants' alleged *ex parte* communications with the Juvenile Court, Defendants' allegedly false and unverified accusations made to the state juvenile court, and other allegedly misleading and coercive actions engaged in by Defendants. But the court finds that Plaintiffs have tried too hard to shoehorn their case into the facts of *Jensen* in order to overcome the *Rooker-Feldman* obstacle to this court's exercise of jurisdiction. The "factual matrix" relevant to Defendants' Motion for Summary Judgment stems almost entirely from state court orders and Plaintiffs' own sworn statements in other court proceedings. *Cf. Carr*, 337 F.3d at 1227. Despite attempts to generate a genuine dispute of material fact in their Opposition, Plaintiffs have failed to provide sufficient evidence that would in any way call into question the factual record and conclusions of law established by the Juvenile Court.[7]

This situation, therefore, is distinguishable from *Jensen*, and the *Rooker-Feldman* doctrine removes the Fourteenth Amendment claim from the court's jurisdiction as well. In

---

[7] The court agrees here with Defendants' evaluation that Plaintiffs' attempts to generate a genuine dispute of material fact rely on often blatant mischaracterizations of the record. For example, Plaintiffs incredibly argue that there was no evidence of abuse to justify the removal orders, "despite Sharon and Kelvin Davis' prior representations that abuse was in fact occurring in the home on a routine basis." (Reply 3 [Dkt. No. 190].) Sharon swore in court filings that Kelvin's practice was to beat KTD with a hanger as discipline for misbehavior and as punishment for potty training accidents. Kelvin swore in other court filings that Sharon was unstable and prone to abuse the children through violence and neglect. Though it is true that some of these filings were in parallel intra-parental custody proceedings (and not directly part of the State's removal proceedings against the parents) (*see* Pl.'s Opp. Mot. Summ. J. xxix-xxxiv [Dkt. No. 180]), the Juvenile Court made similar findings, including, *e.g.*, as to the beatings with the hanger (*see* March 29, 2006 Order, Findings of Fact ¶ 8, attached as Ex. 1 to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170]). Moreover, this court treats Plaintiffs' various statements contained in court documents in the contemporaneous, parallel custody proceedings between the parents as unassailable evidence for purposes of the factual matrix relevant to this Motion for Summary Judgment. To find otherwise would be to entertain a farce intended by Plaintiffs to overcome their own sworn statements in previous court proceedings.

*Jensen* the evidence of facts supporting the allegations of misrepresentation and failure to investigate was apparently sufficient to establish that these claims, though closely connected to the adverse state court proceeding, were nevertheless "extricable from any state-court judgment for *Rooker-Feldman* purposes" and, in fact, would have been "identical even if there were no state-court orders adverse to" the plaintiffs in that case. *Jensen*, 603 F.3d at 1194. That cannot be the case here where Plaintiffs have not provided any evidence that would create a genuine dispute of material fact as to the essentially undisputable facts arising from their own sworn court statements and the Findings of Fact and Conclusions of Law in the Juvenile Court removal Orders at issue here. One such Juvenile Court finding (among many), for example, was that "[t]here has been no denial of due process in the State's request for temporary custody." (Pre-Trial Order dated Nov. 22, 2006, at 4 ¶ 17, attached as Ex. to Def.'s Mem. Supp. Mot. Summ. J. [Dkt. No. 170].) In light of the complete absence of any credible evidence of such misrepresentation or failure to investigate such as through interviewing Kelvin (the latter directly contrary to deposition excerpts provided by Plaintiffs in their Opposition), therefore, the court finds no basis on which the *Jensen* holding would control the Fourteenth Amendment analysis in this case. Plaintiffs' Fourteenth Amendment claims are indistinguishable from those "actually decided by [the] state court" or, at the very least, are "inextricably intertwined with [the] prior state-court judgment[s]." *Mo's Express*, 441 F.3d at 1233. As such, this court lacks jurisdiction to consider them under the *Rooker-Feldman* doctrine.

## C.      Plaintiffs' State Law Claims and the Utah Governmental Immunity Act

Each of Plaintiffs' state law claims are arguably at least "inextricably intertwined with [the] prior state-court judgment[s]," which would deprive this court of jurisdiction over them under the *Rooker-Feldman* doctrine. *See Mo's Express*, 441 F.3d at 1233. The court need not,

however, entertain the complex analysis behind the *Rooker-Feldman* doctrine as applied to the state law claims because it finds that it lacks jurisdiction over these claims by operation of the Utah Governmental Immunity Act ("UGIA").

Plaintiffs failed to file a timely notice of claim under the UGIA for their state law claims based on intentional and negligent infliction of emotional distress, negligence, defamation, negligent hiring, and negligent supervision. The UGIA requires a party with a potential claim against a state governmental entity, or against an employee of a state governmental entity for an act done within the scope of employment, to file a written notice of claim within one year after the claim arises. Utah Code Ann. § 63G-7-402 (2012).[8] Under the UGIA, a claim arises when the statute of limitations on the claim begins to run. This notice of claim requirement is strictly enforced. *See, e.g.*, *Yearsley v. Jensen*, 798 P.2d 1127, 1128-29 (Utah 1990) (dismissing case for lack of jurisdiction under the UGIA where notice of claim was filed one day late); *Dickey v. Dept. of Corr.*, 2004 UT App. 279, 2004 Utah App. LEXIS 308, *1-*2 ("Utah courts have consistently held that suit may not be brought against the state or its subdivisions unless the requirements of the Immunity Act are strictly followed."). Plaintiffs did not file a written notice of claim for their state tort claims until July 23, 2009, more than a year after Plaintiffs initial Complaint filed with this court.[9]

Citing *Rice v. Granite Sch. Dist.*, 456 P.2d 159, 161 (Utah 1969), however, Plaintiffs argue that Defendants should be estopped from raising their notice of claim defense because Defendants have had the opportunity to settle the case, but have not done so. (*See* Pl.'s Opp. Summ. J. 10-11 [Dkt. No. 180].) Plaintiffs contend that the purpose of the UGIA notice

---

[8] Previously codified at Utah Code Ann. § 63-30d-402 (2004), as controlling for the relevant period.
[9] As argued by Defendants, Plaintiffs' claim arose in January or February of 2006 and even counting conservatively from the date of Plaintiffs' filing of their First Amended Complaint on December 11, 2007, "the only notice of claim came more than a year and seven months later (on July 23, 2009), and therefore over seven months too late to satisfy the mandatory requirements of the UGIA." (Def.'s Mem. Supp. Mot. Summ. J. 21 [Dkt. No. 170].)

requirement is to encourage settlement, and because Defendants have not engaged in serious settlement negotiations, they should be estopped from relying on the UGIA notice of claim requirement to bar the suit. (*Id.*) Plaintiffs also argue that Defendants have waived their notice of claim defense because it was never raised prior to discovery in this suit. The court finds these arguments unavailing. In *Rice*, the Utah Supreme Court held that a state entity could be estopped from claiming that a suit was barred by the statute of limitations associated with the notice of claim requirement if the plaintiff could show that the untimely claim was the result of the state entity's insurance companies' assurance that the claim was approved and that Plaintiff would be compensated followed by the denial of the claim. 456 P.2d at 161. The UGIA is a statutory waiver of sovereign immunity in certain specified circumstances. The notice of claim requirement is more than just a statute encouraging settlement. As noted above, Utah courts have treated the UGIA as jurisdictional in many cases, and generally require strict compliance. *See, e.g.*, *Patterson v. Amer. Fork City*, 2003 UT 7 ¶ 10, 67 P.3d 466; *Hall v. Dep't of Corr.*, 2001 UT 34 ¶ 22, 24 P.3d 958; *Dickey*, 2004 UT App. 279, at *2-*3. The State might be estopped from relying on the UGIA to defend a claim where there is a showing that the State (or its insurance carrier) abused the scheme to prevent a valid claim. But that is manifestly not the case here. And Defendants raised the notice of claim defense in their Answer to Plaintiffs' Amended Complaint. Accordingly, the defense did not take Plaintiffs by surprise. Plaintiffs simply failed to comply with their obligations under the UGIA for bringing suit against a state entity.

Plaintiffs correctly argue, however, that the time period to file a notice of claim is tolled for minor children until they reach the age of 18. *See Cole v. Jordan Sch. Dist.*, 899 P.2d 776, 778 (Utah 1995). Minor children have until a year after their 18th birthday to file a notice of claim for any state common law claim against a state entity or state employee. Therefore, the

notice of claim requirement alone prevents the court from exercising jurisdiction over the state tort claims brought by Plaintiffs Kelvin and Sharon Davis exclusively; this provision does not affect the claims of the minor children.

But the UGIA also removes the state tort claims from this court's jurisdiction—both the parent's and the children's state tort claims—because the Complaint in this case was filed before any notice of claim was filed. The UGIA provides that a governmental entity (or its insurance carrier) that receives a notice of claim shall inform a claimant within 60 days whether the claim has been approved or denied. If a claim is denied, the claimant then has one year to file an action in district court. Utah Code Ann. § 63G-7-403. The Utah Supreme Court has held that the requirement that a governmental entity have the opportunity to approve or deny a notice of claim requires that the notice of claim be brought before a claim is filed with a district court. *See Hall v. Dep't of Corr.*, 2001 UT 34, ¶ 22, 24 P.3d 958 ("[W]here the state may be sued . . . potential plaintiffs must provide a formal 'notice of claim' to the appropriate governmental official before bringing their action."). "Utah law is clear that plaintiffs with claims against the state may institute an action in the district court *only after their claim is denied*." *Dickey*, 2004 UT App. 279, at *2-*3 (emphasis added). This might imply that the children's state tort claims be dismissed without prejudice, but it does not because Plaintiffs also have not complied with the UGIA in another important respect.

The UGIA renders an action against a government entity the sole remedy for injury caused by a state employee acting within the scope of his or her employment unless the employee acted or failed to act through fraud or willful misconduct. See Utah Code Ann § 63G-7-202(3) (2012)[10]; *See Baker ex rel. Baker v. Angus*, 910 P.2d 427, 432 (Utah App. 1996). "Willful misconduct" is defined as "the intentional doing of a wrongful act, or the wrongful

[10] Previously codified at Utah Code Ann. § 63-30d-202 (2004), as controlling for the relevant period.

failure to act, without just cause or excuse, where the actor is aware that the actor's conduct will probably result in injury." Utah Code Ann. § 63G-7-102(10) (2012). Moreover, such a showing of fraud or willful misconduct on the part of state employees must be pled and supported in the factual allegations through evidence produced to survive summary judgment under the UGIA. *See Thomson v. Salt Lake County*, 584 F.3d 1304, 1322 (10th Cir. 2009) (citing a former provision of the UGIA for the proposition that a plaintiff's claim against a governmental employee is barred under the UGIA "unless the plaintiff can demonstrate that the government officials acted or failed to act through fraud or malice"); *Becker v. Kroll*, 494 F.3d 904, 927-28 (10th Cir. 2007) (noting that under the UGIA "a plaintiff must show an improper motive such as a desire to do harm"), rev'd in part on other grounds as noted in *Jones v. Metro. Life Ins. Co.*, No. C-08-03971-JW, 2010 U.S. Dist. LEXIS 113219, *36-*37 (N.D. Cal. Oct. 15, 2010).

All state entities have already been dismissed from this case. In order to prevail, therefore, Plaintiffs need to have marshaled evidence sufficient to show at least a genuine dispute of material fact as to whether the remaining individual Defendants acted through fraud or willful misconduct while investigating the abuse to which both Kelvin and Sharon swore in court filings in parallel proceedings or in removing the children from the home. The evidentiary basis for Plaintiffs' Opposition to Defendants' Motion for Summary Judgment is also severely lacking in this respect. Outside of baseless conclusory allegations that, for example, the prior history of abuse of one of the Defendant's prejudiced her against Plaintiffs or that various Defendants were animated by racial bias against Kelvin, Plaintiffs have provided no evidence that would create a genuine issue of material fact on the question of whether any of the Defendants had an improper motive in acting through fraud or willful misconduct toward Plaintiffs at any point in the investigation of abuse or removal of the children. In fact, the Complaint does not even contain

allegations of fraud or willful misconduct. And, as to the removal of the children from the home, Defendants were only involved in that process pursuant to Juvenile Court Orders requiring them to act. This court therefore lacks jurisdiction under the UGIA to consider the state law tort claims raised by any of the Plaintiffs.

Because the court does not have jurisdiction over the state law tort claims pursuant to operation of the UGIA, it need not address Defendants' arguments as to the failure of Plaintiffs' allegations of abuse suffered by the children while in foster care. It will suffice to note that Plaintiffs' claims fail for similar evidentiary reasons and by operation of law under controlling precedent.[11]

The court has also carefully reviewed the defenses to Plaintiffs' claims based on collateral estoppel and qualified immunity. Because the court has concluded it lacks jurisdiction, it has not provided a thorough analysis of these claims. Nevertheless, the court has concluded that if it had jurisdiction, each of Plaintiffs' claims would fail under these defenses. Although the analysis would differ in some respects, the conclusion would be the same under collateral estoppel. Plaintiffs' claims are barred by the rulings of the state court in the juvenile proceedings. Similarly, qualified immunity would bar Plaintiffs' claims because there is no clearly established constitutional right violated when a state actor acts pursuant to a valid court order.

## CONCLUSION

The court GRANTS the Motion for Summary Judgment (Dkt. No. 169) filed by the only remaining Defendants in this case: Wendy Garcia, Lori Holmes, Veronica Kasprzak, Amy Reed, and Charlene Sansone (and Dwayne Betournay) on the basis that it lacks subject matter jurisdiction over Plaintiffs' federal claims pursuant to the *Rooker-Feldman* doctrine and over

---

[11] The court also notes that, to this date, no criminal charges have ever been filed related to any abuse allegations of the minor children while in the temporary custody of DCFS and placed in foster care. (*See* Def.'s Mem. Supp. Mot. Summ. J. xxiii ¶ 98 [Dkt. No. 170].)

Plaintiffs' state law claims under the Utah Governmental Immunity Act. This case is therefore closed.

SO ORDERED this 17th day of June, 2013.

BY THE COURT:

Clark Waddoups
United States District Judge